UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
MARLON ARZU,                       :     14 Civ. 2260 (JCF)
                                   :
            Plaintiff,             :        MEMORANDUM
                                   :        AND   ORDER
      - against -                  :
                                   :
CAROLYN W. COLVIN, Acting          :
Commissioner, Social Security      :
Administration,                    :
                                   :
            Defendant.             :
- - - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

        The plaintiff, Marlon Arzu, brings this action pursuant to

section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. §

405(g), seeking review of a determination of the Commissioner of

Social Security (the "Commissioner") finding that he is not

entitled to disability insurance benefits for the period of October

10, 2007, through March 31, 2012.  The parties have submitted

cross-motions for judgment on the pleadings pursuant to Rule 12(c)

of the Federal Rules of Civil Procedure.  For the reasons set forth

below, the Commissioner's decision is vacated in part and the case

is remanded to the Social Security Administration (the "SSA") for

further proceedings consistent with this opinion.[1]

_____

        [1] The parties have consented to my jurisdiction for all
purposes pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal
Rules of Civil Procedure.

Background

    A. Personal History

    Marlon Arzu was born on November 14, 1972. (R. at 504).[2] He lives at home with his wife and children. Mr. Arzu is fluent in English, but his first language is Spanish. (R. at 506). He has completed at least eleventh grade, and from 1990 to 1993, he worked as a security guard for a stock company. (R. at 114). Mr. Arzu goes to church with his mother nearly every week and he occasionally attends other social functions. (R. at 508). He no longer participates in any sports, but periodically goes to the park with his children. (R. at 508-09, 511).

    B. Medical History Prior to 2010

    Mr. Arzu was born with congenital scoliosis, and in 1989 he had straightening rods implanted. (R. at 180, 356, 509). On January 11, 2006, the plaintiff underwent surgery to remove some of the hardware at the New York University Hospital for Joint Diseases. (R. at 356). During that procedure, Dr. Jeffrey Spivak performed a decompressive lumbar laminectomy (R. at 356-58). The surgery was required because of lower extremity pain and advanced disk degeneration at L4-5. (R. at 356). The degeneration was "stable," but surgery was necessary because of "significant

---

    [2] "R." refers to the Administrative Record.

stenosis" at L3 and L4-5 and the failure of other treatment to alleviate Mr. Arzu's leg pain.  (R. at 357).

The medical records indicate that on January 24, 2006, Mr. Arzu's leg pain had been relieved and he reported no back pain. (R. at 153).  On February 21, 2006, he requested a different brace, but still reported no pain.  (R. at 152).  On April 4, 2006, after beginning physical therapy, Mr. Arzu complained of occasional back spasms, but his back and leg pain had improved.  He was prescribed Neurontin and Skelexin.  (R. at 150).  Mr. Arzu returned to the Hospital for Joint Diseases on July 25, 2006, and reported right thigh and leg pain which was not relieved with Neurontin.  (R. at 148).  On September 5, 2006, he complained of back pain, and straight leg raising[3] was positive on the right side.  (R. at 146). Later, in October 2006, Mr. Arzu reported feeling better after physical therapy and treatment with muscle relaxants.  Straight leg raising was negative, he reported pain only when bending, and he was given permission to travel by train.  (R. 144-45).  On January 23, 2007, Mr. Arzu had a muscle strength rating of 5/5, straight

---

[3] Straight leg raising is a medical test performed in either supine position or the sitting position. The test is positive when the leg is raised and pain is present.  A positive result indicates nerve root compression or tension. See Straight Leg Raising Test, The Free Dictionary, available at http://medical-dictionary.thefreedictionary.com/Laseque+test. (last visited March 24, 2015).

leg raising was negative, and motor strength was intact.  Indeed, the plaintiff reported that even though he had a dull ache in his legs in the morning, and a pain level of 4-5 out of 10, his symptoms were improving.  (R. at 143.)  On August 14, 2007, Mr. Arzu had full motor strength, he had good toe- and heel-walk, sensation was intact, and he displayed no nerve root tension signs.  Yet, he had mild tenderness to palpation and his forward lumbar flexion was limited to 1/4 to the floor.  (R. at 142).

The plaintiff saw Dr. Jamshid Sheikh on November 14, 2007 for a consultative examination.  Dr. Sheikh recorded that Mr. Arzu was 71 inches tall and weighed 176 pounds.  His blood pressure was 160/94 and he walked with a normal gait.  He could squat fully, used no assistive devices, and his strength was 5/5 in the upper and lower extremities.  There was full range of motion of the hips, knees, ankles, shoulders, elbows, forearms, and wrists bilaterally. (R. at 166-67).  Dr. Sheikh opined that the plaintiff had "mild limitations with respect lifting, pushing, pulling, and carrying heavy loads," but no other physical limitations.  (R. at 168).

Mr. Arzu returned to work stocking shelves prior to seeing Dr. Philip J. Glassneer on March 4, 2008, at the Hospital for Joint Diseases Clinic.  That day he sought treatment for back pain which occasionally radiated to his lower left extremity.  The pain worsened with heavy overhead lifting.  (R. at 810, 812).  Dr.

4

Glassneer noted that there were no "hard findings" explaining the back pain.  (R. at 810, 812).  He recommended that the plaintiff could return to work but should limit overhead lifting until the pain subsided.  (R. at 810, 812).

On February 24, 2009, Mr. Arzu again visited the Hospital for Joint Diseases.  On that date, he informed Dr. Scott Robert Hadley that his back pain had been constant for the prior six months.  (R. at 808).  It worsened while sitting and was relieved with standing. Prior to seeing Dr. Hadley, Mr. Arzu attended "back school"[4] which relieved some of his pain.  He had stopped going to "back school" by February 24, however.  (R. at 808).  Dr. Hadley advised Mr. Arzu that he could return to work, but that he should refrain from any heavy lifting or bending.  (R. at 808).

Two months later, on April 21, Mr. Arzu saw Dr. Bryan C. Ding at the Hospital for Joint Diseases complaining of lower back pain. Dr. Ding recommended an epidural steroid injection, prescribed physical therapy, and scheduled an MRI.  (R. at 390).

The MRI took place on April 26, 2009, and imaging revealed mild central canal stenosis at L4-5, posterior fusion with instrumentation at L3, and a persistent marked levoconvex lumbar

---

[4] This is a training protocol for patients with back pain. It consists of education programs and exercise regimens.  See Back School, Physiopedia, available at www.physio-pedia.com/Back_School (last visited March 31, 2015).

curvature at L2.  (R. at 804-05).  Additionally, the MRI showed a new mass lesion compressing the descending right L5 nerve root in the L5 lateral recess.  This mass lesion was thought to represent a complex synovial cyst or a sequestered disc fragment.  (R. at 805).

On June 30, 2009, Mr. Arzu saw Dr. Catherine Noelle Laible at the Hospital for Joint Diseases.  Again he reported feeling lower back pain. "Back school" had resolved his pain, but he had not attended since the previous year.  She prescribed Celebrex and a thoracic lumbar sacral orthosis back brace.  (R. at 801).

On September 22, 2009, Mr. Arzu complained of lower back and left leg pain.  Dr. Justin Park noted that the plaintiff had not been to physical therapy for over four years, did not receive his lumbar epidural injection, and had stopped taking Celebrex and wearing his back brace.[5]  (R. at 388).  The plaintiff claimed that prior lumbar epidural injections did not help and stated that he stopped taking Celebrex because it made him sleepy and stopped wearing the back brace because it was digging into his thighs.  (R. at 388).  The examination revealed that straight leg raising was negative, and Dr. Park recommended "back school."  (R. at 389).

Mr. Arzu again returned to the Hospital for Joint Diseases on

---

[5] Mr. Arzu testified that he discontinued physical therapy because he was no longer covered by Medicaid.  (R. at 62).

November 10, 2009.  He sought treatment for his continued low back pain from Dr. Deepan N. Patel.   Mr. Arzu reported that the 2006 surgery helped with his pain, but did not resolve it completely. He told Dr. Patel that 90% of his pain was in his back and 10% was in his left leg.  The pain worsened at night, but was relieved when he lay supine.  (R. at 796).  Mr. Arzu rated his pain as an 8 on a scale from 1 to 10, yet when medicated, the pain dropped to a 3. (R. at 797).  Dr. Patel advised the plaintiff to avoid strenuous activity and maintain normal activities interspersed with short periods of rest.   He also recommended physical therapy and prescribed Naproxen.  (R. at 796-98).

    C. <u>Medical History From 2010 to April 1, 2012</u>

    Dr. T. Stanley is an orthopedic spine specialist, and on January 5, 2010, he completed a medical source statement concerning Mr. Arzu's ability to perform work-related activities.  (R. at 395-401).  In the report, Dr. Stanley opined that Mr. Arzu could lift and carry up to ten pounds occasionally.  (R. at 395).  He also concluded that Mr. Arzu could sit for one hour, stand for 30 minutes, and walk for 15 minutes at a time without interruption. In addition, Mr. Arzu could sit for eight hours, stand for one hour, and walk for 20 minutes total in an eight-hour day.  He did not require the use of an assistive device to ambulate and he could walk one-half block without an assistive device.  (R. at 396).  Dr.

7

Stanley opined that the plaintiff could use his hands and feet continuously. (R. at 397). Mr. Arzu could continuously crawl, occasionally balance, kneel, and climb stairs, ramps, ladders, or scaffolds. (R. at 398). Dr. Stanley also opined that Mr. Arzu could only occasionally operate a motor vehicle, and could never work near vibrations or at unprotected heights. (R. at 399). Finally, Dr. Stanley reported that Mr. Arzu could go shopping, travel unaccompanied, use public transportation, feed himself, sort files, and care for his personal hygiene, but he could not walk one block at a reasonable pace on rough or uneven surfaces. (R. at 400).

On April 13, 2010, Mr. Arzu returned to the Hospital for Joint Diseases complaining of low back pain and saw Dr. Randy Cohn. Dr. Cohn noted that Mr. Arzu had been noncompliant with physical therapy for several years, and he had a lengthy discussion about the necessity of the therapy. (R. at 794).

On April 22, 2010, Frederick Daniels, Mr. Arzu's physical therapist, reported to Dr. Cohn that the plaintiff complained of a pain rating of 10 out of 10, and that he was experiencing spasms throughout the spine. (R. at 751).

The Division of Disability Determination referred Mr. Arzu to Dr. Eugene Edynak for an orthopedic examination on May 10, 2010. Dr. Edynak's report indicated that the plaintiff had full range of

motion of his hips, knees, and ankles bilaterally. (R. at 754). Both his upper and lower extremities had strength at 5/5 in proximal and distal muscles bilaterally, and there was no muscle atrophy or joint effusion, inflammation, or instability. (R. at 753-754). Hand and finger dexterity was intact and grip strength was 5/5 bilaterally. (R. at 753). Dr. Edynak recorded that Mr. Arzu could walk for one and one-half blocks, his back pain rated at 6 on a scale of 1 to 10, and that his medication lowered the pain to a rating of 4 out of 10. (R. at 752). Mr. Arzu's lateral flexion was 20 degrees to the left, and 20 degrees to the right. And his lateral rotation was 30 degrees to the right and 25 degrees to the left. (R. at 753). During the examination, Mr. Arzu had a normal gait, and he was able to change his clothes and get on and off the examination table without assistance. (R. at 753). Dr. Edynak concluded that Mr. Arzu's prognosis was "fair," and that he had mild to moderate limitations with sitting, standing, walking, climbing stairs, bending, carrying, and heavy lifting because of his chronic low back pain and prior surgery for scoliosis. (R. at 754).

From May 10, 2010, the date of Dr. Edynak's examination, until April 13, 2011, there are no medical reports or opinions in the record. And, from April 13, 2011, until April 1, 2012, the date an Administrative Law Judge found the plaintiff to be disabled, the

9

only medical evidence in the record comes from Dr. Luciano Tuluca. Dr. Tuluca is a pain management specialist and is board certified in physical medicine and rehabilitation.  (R. at 718).

On April 13, 2011, Mr. Arzu saw Dr. Tuluca for low back pain radiating to his left lower extremity.  Dr. Tuluca examined him and found that his coordination was intact but his gait was abnormal. Dr. Tuluca recommended epidural steroid injections and EMG testing. (R. at 758).  Twelve days later, Mr. Arzu again visited Dr. Tuluca complaining of low back pain radiating to his left lower extremity. Dr. Tuluca determined that motor strength was -3/5 in the left lower extremity.  (R. at 760-61).

A lumbar epidural steroid injection was administered by Dr. Tuluca on May 12, 2011. (R. at 762-63).  Three additional steroid injections were administered on June 15, 2011, July 27, 2011, and November 16, 2011.  (R. at 768-69, 772-73, 778-79).  After each of these treatments, Mr. Arzu reported a reduction in his pain level. For example, on May 27, 2011, he rated his pain at 3 out of 10 following the May 12 injection, and he was walking and sleeping better.  (R. at 764-65).  On June 29, 2011, Mr. Arzu told Dr. Tuluca that he was able to walk without an assistive device following the June 15 injection and was sleeping well. (R. at 770-71).  On August 17, 2011, he reported an 80 percent improvement in his pain level following the July 27 injection, and his motor

10

strength was 4/5 in the lower extremities.  (R. at 774-75).  And on December 6, 2011, Mr. Arzu reported 90 percent relief following the November 16 injection, his motor strength was 5/5 in the lower extremities, and straight leg raising was negative.  (R. at 780-81).

However, in between the epidural steroid injections, Mr. Arzu's pain increased, his physical capabilities diminished, and additional clinical presentations appeared.  On June 6, 2011, he underwent a magnetic resonance imaging of the lumbar spine.  The MRI revealed L4-5 disc herniation which was deforming the thecal sac.  There was also a L5-S1 disc bulge and prominent disc degenerative changes at both L4-5 and L5-S1.  (R. at 720).  The examiner noted marked levoscoliosis and a right proximal neural foraminal extension approaching the exiting right L5 nerve root. (R. at 721).  Two days later, Mr. Arzu saw Dr. Tuluca and reported that he was unable to sit or stand for long periods of time.  (R. at 766).  An exam revealed 3/5 motor strength in the left lower extremity and 4/5 in the right lower extremity.  There was tenderness to palpation, and straight leg raising was positive on the right side.  (R. at 767).  On October 5, 2011, Mr. Arzu reported 80 percent relief and he said he was ambulating normally, yet still experiencing low back pain which radiated to the lower left extremity.  Motor strength was 4/5 for the lower extremities,

and straight leg raising was positive on the left side. (R. at 776-77). On January 17, 2012, Mr. Arzu told Dr. Tuluca that the pain was tolerable, although it prevented him from sleeping on his right side. (R. at 782). On February 28, 2012 Mr. Arzu reported that he still had pain whenever he walked or stood for an extended period of time. And he was feeling numbness and tingling in his lower extremities. (R. at 783).

On February 29, 2012, Mr. Arzu had an x-ray on his knees which showed bilateral patella variants with subluxations.[6] There was minimal narrowing of bilateral medial compartments and left thigh densities resembling gunshot fragments. Additionally, the x-ray revealed calcium deposits behind the right knee joint. (R. at 749).

Dr. Tuluca again examined Mr. Arzu on March 21, 2012. The plaintiff reported that he was doing better but complained of bilateral aching and burning knee pain. The pain went from the thigh to the knee, and straight leg raising was positive on the right side. (R. at 784-85).

Dr. Tuluca wrote two letters contained in the record. One is

---

[6] A patellar subluxation is a partial dislocation of the kneecap. See University of Connecticut Musculoskeletal Institute, Patellar Dislocation, available at http://www.nemsi.uchc.edu/clinical_services/orthopaedic/knee/pate llar_dislocation.html (last visited March 25, 2015).

dated June 7, 2011; the other, March 21, 2012.  The first letter is addressed "To Whom It May Concern" and provides a brief recitation of Mr. Arzu's medical history and a description of an exam performed by Dr. Tuluca.  At the time of the letter, the plaintiff's hip flexion was only 40 to 50 degrees and hip extension was 10 to 15 degrees.  (R. at 717).  Muscle strength was rated as 4/5 in the right lower extremity and -3/5 in the left lower extremity. Straight leg raising was positive at 40 degrees.  There was positive tenderness at L4-S1, and Mr. Arzu's gait was abnormal. (R. at 717).  Dr. Tuluca stated that "the patient is totally disabled and unable to perform any job . . . ."  (R. at 718).

The second letter is a word-for-word replica of the first letter.  Every word, number, and punctuation mark in the March 21, 2012 letter is the same as the June 7, 2011 letter.  Only the date was changed. (R. at 717-18, 756-57).

D. Medical History After April 1, 2012

On April 16, 2012, Mr. Arzu was again examined by Dr. Tuluca. (R. at 722-25).  During the examination, he walked with an antalgic gait and his motor strength in the right hip, knee, and ankle was rated at 3/5.  (R. at 724).  Dr. Tuluca performed certain "special tests" on the right lower extremity: the femoral nerve traction test, Patrick-Fabere test, and the supine straight leg raising test were all positive.  (R. at 724).  Dr. Tuluca ordered another

epidural injection. (R. at 724). Seven days later, an electromyography ("EMG") revealed abnormalities in the left peroneal motor nerve, the left and right tibial motor nerves, the left and right sup peron sensory nerves, and the left and right sural sensory nerves. (R. at 787). All other nerves were within normal limits, and muscles showed no evidence of electrical instability. (R. at 787).

In May 2012, Mr. Arzu reported significant reductions in his pain level. On May 7, he described excellent pain relief, and on May 24, he reported that his knee pain was 50 percent better after an injection. (R. at 726, 730). Yet, he still complained of limited mobility and severe pain when climbing stairs and walking. (R. at 726, 730). Also on May 24, Dr. Tuluca completed a medical source statement. In that statement, he opined that Mr. Arzu could sit for less than one hour, and stand or walk for less than one hour in an eight-hour day. (R. at 790-91). Additionally, Dr. Tuluca recommended that Mr. Arzu rest for two hours during an eight-hour work day. (R. at 791).

On June 5, 2012, Dr. Tuluca saw the plaintiff and found decreased sensation of the right upper and lower thigh, and reduced range of motion of the right knee to 15 degrees. (R. at 734-35). Mr. Arzu told Dr. Tuluca that he was feeling pain, numbness, buckling, and instability when standing, walking, and going up or

down stairs.  (R. at 735).  Dr. Tuluca noted that Mr. Arzu's pain was no longer improving with injections.  (R. at 736).

Mr. Arzu received another epidural steroid injection on July 19, 2012.  (R. at 739-40).  At that time his motor strength was rated as 3/5 in the right ankle, straight leg raising was positive, and extension was limited.  (R. at 739).  One month after the injection, Mr. Arzu reported pain relief from both the steroids and his medication.  He still complained of pain, weakness, and numbness in his lower back, and straight leg raising was positive.  (R. at 742-43).  On September 12, 2012, Mr. Arzu again reported pain relief from the July injection.  (R. at 746).

Mr. Arzu first saw Dr. Tsai C. Chao on March 16, 2013.  Dr. Chao observed tenderness and muscle spasm in Mr. Arzu's back.  Straight leg raising was positive on the right side at 45 degrees, and there was right calf atrophy.  (R. at 814).  Dr. Chao diagnosed chronic right discogenic lower back pain with L4-5 herniation, right sacroiliac joint dysfunction, and osteoarthritis of the knees.  (R. at 815).

E. Procedural History

Mr. Arzu filed a claim for SSI disability benefits on October 10, 2007.  He indicated he became disabled in November 1973 due to scoliosis and high blood pressure.  (R. at 101).  That application was denied on November 29, 2007.  (R. at 73-76).  The plaintiff

sought review and on September 17, 2009, he appeared <u>pro se</u> for a
hearing before administrative law judge ("ALJ") Paul A. Heyman.
(R. at 49).  At that hearing, Mr. Arzu testified that he could only
walk approximately five blocks before needing rest, though he
occasionally took his daughters to the park. (R. at 60, 66).  He
testified that he did not drink alcohol, but he had gained weight
recently.  (R. at 53, 66).  Mr. Arzu stated that he could travel by
bus, and his medication made him drowsy.  (R. at 55, 59).  ALJ
Heyman issued a decision denying the application on February 19,
2010.  (R. at 35-44).  On April 5, 2012, that decision became final
when the Appeals Council denied Mr. Arzu's request for further
review.  (R. at 1).  The plaintiff then filed a civil action in the
United States District Court for the Southern District of New York.
And on November 4, 2012, the District Court remanded the case to
the Commissioner for further proceedings pursuant to a stipulation.
(R. at 438-40.)

While that case was pending, Mr. Arzu submitted a second
application for SSI disability benefits on April 8, 2010.  (R. at
465).  The second claim was also denied, and on June 11, 2012, he
appeared at a hearing before ALJ Selwyn C. Walters.  (R. at 470-
96).  ALJ Walters issued a decision denying Mr. Arzu's claim on
July 13, 2012.  (R. at 444-57).

Meanwhile, the original 2007 claim was remanded by the SSA

Appeals Council for another administrative hearing.  That hearing took place on September 4, 2013.  (R. at 497-538).  ALJ Walters consolidated the two cases and reviewed them de novo.  (R. at 500-01).  At the 2013 hearing, Mr. Arzu testified that he could only walk approximately one and one-half blocks before resting, and he reported that he could only sit for 45 minutes before having to stand and stretch.  (R. at 491, 513).  He also stated that his lower back and leg pain required him to lie down several times each day.  (R. at 493).  On December 5, 2013, ALJ Walters issued a decision which found that from October 10, 2007, through March 31, 2012, the plaintiff was not disabled, but that since April 1, 2012, the plaintiff has been disabled.  (R. at 409-25).  This action followed.

<u>Analytical Framework</u>

    A.    <u>Determination of Disability</u>

    A claimant is disabled under the Act and therefore entitled to benefits if he can demonstrate through medical evidence that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); <u>see also</u> <u>Hahn v. Astrue</u>, No. 08 Civ. 4261, 2009 WL 1490775, at *6 (S.D.N.Y. May 27, 2009); <u>Marrero</u>

_v. Apfel_, 87 F. Supp. 2d 340, 345-46 (S.D.N.Y. 2000). The disability must be of "such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The SSA has created a five-step procedure for evaluating claims for Supplemental Social Security Income and Disability Insurance Benefits ("DIB"). 20 C.F.R. §§ 404.1520, 416.920. First, the claimant must demonstrate that he is not currently engaged in a substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). Next, the claimant must prove that he has a severe impairment that "significantly limits his physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). Then, if the impairment is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 or is the substantial equivalent of a listed impairment, the claimant is automatically considered disabled. 20 C.F.R. §§ 404.1520(d), 416.920(d). However, if the claimant's impairment is neither listed nor equals any listed impairment, he must prove that he does not have the residual capacity to perform his past work. 20 C.F.R. §§ 404.1520(e), 416.920(e). Finally, if the claimant satisfies his burden of proof on the first four steps, the burden shifts to the

Commissioner to demonstrate that there is alternative substantial gainful employment in the national economy that the claimant can perform.  20 C.F.R. § 404.1520(a)(4)(v), (g); Longbardi v. Astrue, No. 07 Civ. 5952, 2009 WL 50140, at *23 (S.D.N.Y. Jan. 7, 2009) (citing Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999), and Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986)).  In order to determine whether the claimant can perform other substantial, gainful employment, the Commissioner must consider objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability, and the claimant's educational background, age, and work experience.  Hahn, 2009 WL 1490775, at *7 (citing Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam)).

     B.   Judicial Review

A court reviewing the Commissioner's decision "'may set aside a decision of the Commissioner if it is based on legal error or if it is not supported by substantial evidence.'"  Hahn, 2009 WL 1490775, at *6 (quoting Bonet v. Astrue, No. 05 Civ. 2970, 2008 WL 4058705, at *2 (S.D.N.Y. Aug. 22, 2008)).  Judicial review, therefore, involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal standard. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ. 4254, 2008 WL 4452359, at *8 (S.D.N.Y. April

29, 2008).  Second, the court must decide whether the ALJ's decision was supported by substantial evidence.  "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  Longbardi, 2009 WL 50140, at *21 (citing Brown, 174 F.3d at 62, and Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988)).  Substantial evidence in this context is "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Hahn, 2009 WL 1490775, at *6 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)); see also Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam).  "If substantial evidence supports the Commissioner's decision, then it must be upheld, even if substantial evidence also supports the contrary result."  Ventura v. Barnhart, No. 04 Civ. 9018, 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)).  Additionally, the Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).

C.   The ALJ's Decision

As detailed above, the Act sets out a five-step evaluation process to determine whether claimants are disabled.  20 C.F.R. §

416.920(a).  ALJ Walters determined at step one that Mr. Arzu had
not engaged in substantial gainful activity since October 10, 2007,
the application date.  (R. at 414).  At step two, he found that the
plaintiff's spinal stenosis and the osteoarthritis in his knees
were "severe."   (R. at 414).   At the third step, the ALJ
"considered" the listing for disorders of the spine under the SSA
regulations appendix, 20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.04A.
(R. at 415).  But ultimately, he determined that the plaintiff's
impairments did not meet or medically equal the severity of any
listed impairment because of the lack of "sufficient and sustained
neurological signs." (R. at 415). At step four, the ALJ found that
from October 10, 2007, the date of the application, until April 1,
2012, the plaintiff had the residual functional capacity to perform
a  full  range  of  sedentary  work,  except  that  he  could  only
occasionally stoop, crouch, and climb stairs.   Additionally, he
found that as of April 1, 2012, the plaintiff has been unable to
meet the requirements of sedentary work, and has thus been disabled
since that date.  (R. at 415, 424).  In making this determination,
the ALJ assigned "significant weight" to the opinions of Dr.
Sheikh, Dr. Glassneer, Dr. Hadley and Dr. Edynak, which were
rendered between November 2007 and May 2010.   (R. at 420).
Additionally, the ALJ "accepted" the January 5, 2010, opinion of
Dr. Stanley and gave it significant weight except for the portion

of his opinion which included restrictions on walking up to 20 minutes and stooping. That part of Dr. Stanley's opinion was given "some, but not significant weight." (R. at 418). Moreover, ALJ Walters did not accord the opinion of Dr. Tuluca significant weight. He gave Dr. Tuluca's opinion prior to April 2012 "little weight," and his opinion since April 2012 "some weight." (R. at 421). At step four, the ALJ found that the plaintiff had no past relevant work experience. (R. at 424). And, after considering the plaintiff's residual functional capacity to perform sedentary work, his age, education and work experience, the ALJ held that the plaintiff was not disabled from October 10, 2007, through March 31, 2012. However, since April 1, 2012, the ALJ found that the plaintiff has been disabled. (R. at 424).

Discussion

    A.   Treating Physician Rule

The SSA regulations establish that "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (alteration in original) (quoting 20 C.F.R. § 404.1527(d)(2)); accord Green-Younger v. Barnhart, 335

F.3d 99, 106 (2d Cir. 2003); <u>Correale-Englehart v. Astrue</u>, 687 F.
Supp. 2d 396, 426 (S.D.N.Y. 2010).  "This preference is generally
justified because treating sources are likely to be 'the medical
professionals most able to provide a detailed, longitudinal
picture' of a plaintiff's medical impairments and offer a unique
perspective that the medical tests and SSA consultants are unable
to obtain or communicate."  <u>Correale-Englehart</u>, 687 F. Supp. 2d at
426 (quoting 20 C.F.R. § 416.927(d)(2)).  However, determination of
"dispositive" issues, such as whether the plaintiff "meet[s] the
statutory definition of disability" and cannot work, are reserved
for the Commissioner.  20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1);
<u>see</u> <u>Snell v. Apfel</u>, 177 F.3d 128, 133 (2d Cir. 1999).

If the ALJ determines that a treating physician's opinion is
not controlling, he is nevertheless required to consider the
following factors in determining the weight to be given to that
opinion: (1) the length of the treatment relationship and the
frequency of examination; (2) the nature and extent of the
relationship; (3) the evidence provided to support the treating
physician's opinion; (4) the consistency of the opinion with the
record as a whole; (5) whether the opinion is from a specialist;
and (6) other factors brought to the Commissioner's attention that
tend to support or contradict the opinion.  20 C.F.R. §
404.1527(c); <u>see</u> <u>Halloran</u>, 362 F.3d at 32.  The ALJ is not required

23

to give the treating physician controlling weight, but he is required to give "good reasons" for the assignment of weight that he chooses.  20 C.F.R. § 404.1527(c)(2).  "Reserving the ultimate issue of disability to the Commissioner relieves the Social Security Administration of having to credit a doctor's finding of disability, but it does not exempt administrative decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited."  Snell, 177 F.3d at 134.

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even -- and perhaps especially -- when those dispositions are unfavorable.  A claimant . . . who knows that [his] physician has deemed [him] disabled[] might be especially bewildered when told by an administrative bureaucracy that [he] is not, unless some reason for the agency's decision is supplied.  [A claimant] is not entitled to have [his physician]'s opinion on the ultimate question of disability be treated as controlling, but [he] is entitled to be told why the Commissioner has decided -- as under appropriate circumstances is his right -- to disagree with [the treating physician].

Id. (internal citation omitted)(remanding case to Appeals Council for statement of reasons why treating physician's finding of disability was rejected).

Here, ALJ Walters found that the plaintiff had the residual functional capacity to perform a full range of sedentary work from the date of his application, October 10, 2007, until April 1, 2012, and thus, was not disabled during that period, but also found that the plaintiff has been disabled since April 1, 2012.  (R. at 424).

In making this determination, the ALJ assigned "little weight" to the opinion of Dr. Tuluca prior to April 1, 2012 because, according to the ALJ, that opinion did not comport with other contemporaneous medical reports compiled by Dr. Tuluca himself.   (R. at 421). Additionally, the ALJ accepted Dr. Stanley's entire opinion except for the portion which imposed limitations on Mr. Arzu's ability to walk and stoop because of internal inconsistencies within that opinion.  (R. at 417).   Yet, when examined in light of the entire record, the ALJ's reasons for finding inconsistency in these two opinions are not supported by substantial evidence.

    1.  <u>Treating Physicians Prior to 2010</u>

ALJ Walters accorded Dr. Sheikh's opinion controlling weight, and that decision is supported by substantial evidence.   Dr. Sheikh's determination that the plaintiff had mild limitations concerning only pushing, pulling, and lifting is buttressed by other medical evidence from 2007.   During various visits to the Hospital for Joint Diseases, Mr. Arzu had "good toe-walk [and] heel-walk," and he reported that his symptoms were getting better. (R. at 141-43).   The fact that Mr. Arzu returned to work sometime before March 2008 further supports the ALJ's conclusion that he had the residual functional capacity to perform sedentary work.  (R. at 810).

During the years of 2008 and 2009, the administrative record

shows that Mr. Arzu saw at least six doctors at the Hospital for Joint Diseases and underwent numerous diagnostic and therapeutic procedures.   Each visit was for low back pain, and the reports generally showed that with treatment, the pain subsided.   Each doctor prescribed physical therapy, and there were no significant physical limitations identified.   Specifically, Dr. Glassneer and Dr. Hadley advised Mr. Arzu that he could return to work so long as refrained from any heavy lifting.   (R. at 808, 812.)   These two physicians were singled out by the ALJ, and he accorded their opinions "significant weight."   (R. at 420).   This is relevant because Drs. Glassneer and Hadley provided direct evidence that the plaintiff had the residual functional capacity for at least sedentary work.   Additionally, Mr. Arzu testified at a hearing on September 17, 2009, that he was "doing a lot of stuff."   When asked to clarify, he responded, "I clean the house. Sometimes I have to mop, sweep, because I live by myself."   (R. at 65).   None of the doctors seen by Mr. Arzu in 2008 or 2009 reported any specific walking, standing, or sitting limitations.   Moreover, the plaintiff testified at the hearing in 2009 that he could walk five blocks before needing rest, and he made no mention of any limitations with regards to sitting.   (R. at 60).

The claimant has the burden to bring forward medical evidence demonstrating disability. 42 U.S.C. § 423(d)(5)(A); see also Bowen

v. Yuckert, 482 U.S. 137, 146 (1987).  Here, the medical evidence in the record, coupled with the plaintiff's own testimony concerning his physical capabilities, provides substantial evidence for the ALJ's determination that Mr. Arzu had the residual functional capacity to perform sedentary work.  Accordingly, because there is substantial evidence to support the opinions of the treating physicians prior to 2010, ALJ Walters properly determined that Mr. Arzu had the residual functional capacity to perform sedentary work within that time period.

2.  Opinion of Dr. T. Stanley

On January 5, 2010, Dr. Stanley filled out a medical source statement after examining Mr. Arzu.  ALJ Walters gave Dr. Stanley's opinion significant weight apart from two specific findings concerning the plaintiff's physical limitations.  (R. at 417-18).  Those limitations were that Mr. Arzu could "never" stoop, and that he could only walk for a total of 20 minutes in an eight-hour day.  (R. at 396, 398).  The ALJ accorded Dr. Stanley's opinion as to these limitations "some, but not significant, weight."  (R. at 418).  An ALJ is permitted to assign weight to a treating physician's opinion that is less than controlling.  However, when doing so the ALJ must "comprehensively set forth reasons for the weight assigned."  Halloran, 362 F.3d at 33.  ALJ Walters gave two reasons for discounting the two limitations in Dr. Stanley's

27

opinion.  First, he found that these restrictions did not comport with the "clinical examinations discussed above."  (R. at 417). And second, he noted that, in the same report, Dr. Stanley opined that the plaintiff could shop, use public transportation, and travel unaccompanied.  (R. at 417).  The ALJ believed that these differing evaluations conflicted and could not both be accurate.

The ALJ's first contention is that the limitations reported by Dr. Stanley are contradicted by other medical evidence "discussed above."  (R. at 417.)  This is in reference to the numerous reports compiled by the doctors at the Hospital for Joint Diseases from 2007 through 2009.  Yet, as previously noted, none of the doctors from the Hospital for Joint Diseases who saw Mr. Arzu in 2008 and 2009 reported or opined on his walking capability.  Because they did not make any assessments concerning the plaintiff's walking capability, their opinions cannot be construed as evidence that Dr. Stanley's opinion on the plaintiff's walking capability is deficient.  Affirmative evidence, rather than mere silence on a relevant issue, is required to find that a claimant is capable of performing sedentary work.  See Rosa, 168 F.3d at 80-81.  Moreover, the ALJ relied on the opinions from doctors who examined Mr. Arzu up to two years prior to Dr. Stanley in order to conclude that he was not disabled in January 2010.  By doing so, the AlJ did not take into account the deterioration of Mr. Arzu's condition over

time.

Next, in rejecting Dr. Stanley's opinion that the plaintiff could only walk for 20 minutes in and eight-hour day, the ALJ pointed to another of Dr. Stanley's opinions from the same report. Dr. Stanley opined that Mr. Arzu had the capability to shop and use public transportation, and the ALJ believed that if the plaintiff could perform those activities, it showed that the could in fact walk for more than 20 minutes.   (R. at 420).   That is not substantial evidence.   If an ALJ believes a doctor's report to be inconsistent or insufficient, then he has the affirmative duty to seek clarification before rejecting the opinion.   See Stroud v. Commissioner of Social Security, No. 13 Civ. 3251, 2014 WL 4652581, at *10 & n.10 (S.D.N.Y. Sept. 8, 2014); Correale-Englehart, 687 F. Supp. 2d at 428.   Here, the ALJ did not seek clarification for the alleged contradiction.   And, it appears that there is no contradiction.   There is no evidence in the record to indicate that using public transportation is inconsistent with a 20 minute walking limitation.   Neither of the ALJ's reasons for discounting Dr. Stanley's opinion is based on substantial evidence.

Because there is not substantial evidence to support discounting Dr. Stanley's opinion, it should be accepted and used to determine Mr. Arzu's disability.   The SSA regulations define sedentary work to require sitting, and "occasionally" walking and

standing.   20 C.F.R. § 404.1567(a).   For sedentary work, walking and standing should total no more than two hours in an eight-hour work day and sitting should total approximately six hours in an eight-hour day.   See Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996) (citing Social Security Ruling 83-10).   Because a person must be able to stand or walk for up to two hours to perform sedentary work, a treating physician's determination that a claimant can walk for less than two hours could be dispositive.   See Carvey v. Astrue, 380 F. App'x 50, 51 (2d Cir. 2010).   Consequently, since Dr. Stanley's opinion that Mr. Arzu could not walk more than 20 minutes in an eight-hour day should be given controlling weight, the plaintiff did not have the residual functional capacity to perform sedentary work.

### 3. Opinion of Dr. Eugene Edynak

ALJ Walters gave the opinion of Dr. Edynak, a consultative examiner, "significant weight." (R. at 420).   In his report, Dr. Edynak makes numerous medical evaluations, which are neither contested by the parties nor questioned by the ALJ.   The issue with the opinion arises because Dr. Edynak identified Mr. Arzu as having "mild to moderate limitation with sitting, standing, walking, climbing stairs, bending, carrying, and heavy lifting because of his chronic low back pain and status post repair of scoliosis." (R. at 754).   Neither the defendant nor the ALJ discusses this

"mild to moderate" limitation in any detail.  The plaintiff, however, argues that such a limitation on sitting and standing precludes him from performing sedentary work, as sedentary work requires up to two hours of standing and six hours of sitting. (Pl. Memo. at 24).  However, it is unclear whether "mild to moderate" limitations precludes a claimant from performing sedentary work under these definitions.  In fact, the meaning of such vague determinations are "left to the ALJ's sheer speculation." <u>Selian v. Astrue</u>, 708 F.3d 409, 421 (2d Cir. 2013). The ALJ used the entirety of Dr Edynak's opinion as evidence that Mr. Arzu had the residual functional capacity to perform sedentary work.  Yet, the opinion appears to support the opposite conclusion. Moderate sitting, walking, and standing limitations could prevent one from standing and walking up to two hours in an eight-hour day. And in this case, a "moderate" limitation does not clearly contradict Dr. Stanley's prior determination that Mr. Arzu could only walk for 20 minutes in an eight-hour day.  Accordingly, Dr. Edynak's opinion is not substantial evidence for a finding that Mr. Arzu has the residual functional capacity to perform sedentary work.

### 4. <u>Opinion of Dr. Luciano Tuluca</u>

ALJ Walters assigned "little weight" to the opinion of Dr. Tuluca prior to April 1, 2012.  He also wrote that Dr. Tuluca's

opinion concerning the plaintiff's standing, walking, and sitting limitations was "disingenuous and seems to be designed to ensure that the claimant is found disabled." (R. at 421). Dr. Tuluca's written opinions that Mr. Arzu was totally disabled intrude on decisions reserved to the Commissioner. Specifically, the SSA regulations note that opinions on whether a claimant is disabled are not medical opinions, rather they are issues which are dispositive of a case and left to the Commissioner. 20 C.F.R. § 416.927(d)(1). Thus, Dr. Tuluca's letters from June 7, 2011 and March 21, 2012, are not entitled to any special deference. See 20 C.F.R. § 416.927(d)(3).

However, Dr. Tuluca's opinions contained within medical reports from the time he began seeing Mr. Arzu on April 13, 2011, until April 1, 2012, are entitled to controlling weight so long as they are well supported and are not inconsistent with other substantial evidence. 20 C.F.R. § 416.927(c)(2). And, as noted above, from May 10, 2010, until April 1, 2012, Dr. Tuluca's examination reports are the only medical evidence in the record. Thus, inconsistencies could come only from Dr. Tuluca's other medical reports. And that is where the ALJ purports to have found one. He notes Mr. Arzu's "dramatic clinical improvement" observed at several examinations near the end of 2011 and the beginning of 2012. (R. at 421). And he uses these improvements to conclude

32

that the plaintiff's pain was not accompanied by the "medical signs or laboratory findings" required by 20 C.F.R. § 404.1529.  While the plaintiff did report improvements on those dates, the ALJ fails to discuss the timing of those visits or their relation to the various treatments prescribed by Dr. Tuluca.  From May to November 2011, Mr. Arzu received four epidural steroid injections from Dr. Tuluca.  And each positive examination cited by the ALJ occurred not more than three weeks after an administration.  Mr. Arzu acknowledged that the injections provided relief from his back pain, but he testified that eventually, the effects of the steroids wore off such that the pain returned to previous levels.  (R. at 494-95).  That testimony is supported by Dr. Tuluca's reports.  And those reports provide the objective medical evidence required to demonstrate disability.  During visits that did not occur shortly after steroid injections, clinical manifestation of diminished capacity returned.  Each of these exams revealed positive straight leg raising and ratings of less than 5/5 motor strength in the lower extremities.  Additionally, Mr. Arzu reported new symptoms of numbness accompanied by new structural abnormalities.  An MRI from June 7, 2011, revealed "[p]rominent disc degenerative changes" at both L4-5 and L5-S1.  (R. at 720).  This represents an increase in severity when compared to the results from an MRI performed on April 26, 2009, which revealed only "mild to moderate" degenerative

changes at L5-S1.  (R. at 804).  Such new physical manifestations are substantial evidence of the plaintiff's pain, loss of function, and inability to ambulate effectively.

Accordingly, there is not sufficient evidence for the ALJ to discount Dr. Tuluca's opinion.  Dr. Tuluca's clinical records, when viewed in light of the entire record, do not support the conclusion that Mr. Arzu had the capability to perform sedentary work from January 2010 to April 1, 2012.

B.   Remedy

Under 42 U.S.C. § 405(g), the district court has the power to affirm, modify, or reverse the ALJ's decision with or without remanding the case for a rehearing.  Here, the ALJ's decision that Mr. Arzu was not disabled from October 10, 2007, until January 4, 2010, is supported by substantial evidence, and is affirmed. However, the ALJ's decision that Mr. Arzu was not disabled from January 5, 2010 until March 31, 2012 is not supported by substantial evidence and must be reversed.  Since the plaintiff has shown he is entitled to disability insurance benefits, the case shall be remanded to the Commissioner for computation and award of benefits for the time period indicated.

Conclusion

For the reasons set forth above, the plaintiff's motion for judgment on the pleadings (Docket no. 14) is granted, the

defendant's cross-motion (Docket no. 19) is denied, and the case is remanded to the Commissioner solely for the calculation of benefits.

SO ORDERED.

James C. Francis IV

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       April 1, 2015

Copies mailed this date:

Christopher J. Bowes, Esq.
54 Cobblestone Dr.
Shoreham, NY 11786

Leslie A. Ramirez-Fisher, Esq.
Assistant U.S. Attorney
86 Chambers Street, 3rd Floor
New York, NY 10007

35